(Summit County Court of Common Pleas.)

DAVID MEYER *v.* STATE OF OHIO.

1. *Sufficiency of affidavit charging unlawful sale of wine.*—An affidavit charging an "unlawful sale of a certain quantity of wine in package containing about twenty-six gallons, as and for blackberry wine, a certain compound and mixture consisting of wine, sugar water, alcohol, salicylic acid and aniline red," defines a violation of the first section of the act as amended March 26, 1891, 88 Ohio Laws, 231, and does not come within the exceptions of the sixth section of the act, Revised Statutes, 7456—26.

2. *To reverse judgment record must show prejudicial error.*—Though error intervenes in the trial, yet to justify a reversal of the judgment, the record must affirmatively show that it was to the prejudice of the plaintiff in error.

3. *Jurisdiction as affected by delivery of prohibited article to common carrier out of state.*—The fact that S., the dealer, whose place of business is Pittsburgh, Pa., where he delivered the prohibited article to a common carrier of his own selection, to be delivered to H., the purchaser, at Akron, of whom the accused, as the agent of S., had solicited the sale at Akron, and procured his order for the prohibited article, which order the accused transmitted by mail from Akron to S., at Pittsburgh, and pursuant to which the article was so shipped to H. and delivered by the common carrier to H. at Akron, and

the accused afterwards collected the purchase price therefor at Akron, constitute such violation of the statute at Akron, that accused may be prosecuted criminally in the county in which Akron is situated.

4. *Neglect to charge the jury where no request is made.*—It was not reversible error for the justice of the peace, trying the case, to neglect to charge the jury, the accused not making any request to give any matter in charge to the jury.

5. *When evidence of want of knowledge may be excluded.*—It is no reversible error for the trial court to exclude evidence of the accused on his trial, he being a witness, that he had no knowledge that the liquors sent to H. were any other than pure liquors of the kinds described in his order mailed to his principal, and that he had no knowledge that S. had any adulterated liquors of the kinds mentioned in his order, when his examination as a witness showed what knowledge he had, and his means of knowledge and that to be ignorant under the circumstances was not the ignorance in good faith, but of criminal negligence; and when taking all the evidence into consideration, there could be no reasonable doubt of his guilty knowledge, and the record, taken as a whole, showing clearly that he had a fair trial.

(Decided January Term, 1895.)

Voris, J.

The accused was tried by a jury, convicted and adjudged to pay a fine of $600, by the determination of P. H. Hoffman, a justice of the peace of Akron township, Summit county, and as set out in the affidavit, for an "unlawful sale of a certain quantity of wine in package containing about twenty-six gallons, as and for blackberry wine, a certain compound and mixture consisting of wine, sugar, water, alcohol, salicylic acid and aniline red," contrary to the statute, etc., which we hold defines a violation of the first section of the act as amended March 26, 1891, 88 O. L. 231, and does not come within the exceptions of the sixth section of the act, Rev. Stat., 7456—26.

This holding disposes of the error assigned because the trial court overruled the defendant's motion to arrest judgment for the reason that the affidavit did not state facts sufficient to constitute an offense under the laws of the state.

The other errors assigned, which we deem important to consider, exist, if at all, by reason of errors of the trial court, in the progress of the trial, and in the refusal to grant a new trial, and may be summarized as follows:

1. Does the fact that some part of the transaction that constituted the executed sale was enacted in Pennsylvania, oust the trial court of jurisdiction to try and adjudge the cause?

2. Did the justice of the peace err in not charging the jury?

3. And was it error to exclude the accused's offer to show that he had no knowledge that would impeach his good faith in the sale made by him?

Before we consider the matters involved in this case we will announce the principle by which we are to be governed in determining whether the record contains such errors as ought or ought not to prevail, to set aside the judgment in this case.

"A judgment will not be reversed merely because the record shows error to which exception was taken. The error to be ground of reversal must be prejudicial to the rights of the party complaining. This is the rule in criminal as well as in civil cases." *McHugh* v. *State*, 42 Ohio St. 155 ; *Schoven* v. *State*, 6 Ohio St. 289.

In the latter case, the rule is stated more forcibly, as follows: "In order to justify the reversal of a judgment in error, the record must affirmatively show not only that error intervened, but that it was to the prejudice of the party seeking to take advantage of it." This has been the rule in Ohio for a period antedating my recollection. It is however true, "ordinarily that if a statutory provision or principle of the common

law applicable to the case is disregarded on the trial of a person charged with crime, when its enforcement would tend to preserve his right to an impartial trial, he is to be regarded as prejudiced in his substantial rights ; * * * still the court must determine whether the failure to observe such form, tended in any way to deprive the accused of a fair trial, and whether, looking to the statutory provisions relating to criminal procedure, it was intended that such failure should necessarily require a a reversal of the judgment." *McHugh* v. *State, supra,* page 158.

If we can say, from a review of the whole record, that the plaintiff in error has had a fair trial, our duty is plain that we should affirm the judgment ; if he has not had a fair trial, then it is equally our duty to reverse it.

We ought, in consideration of the gravity of the case, to dispose of the objection raised in argument, though not specifically assigned as error, that the evidence showed this to have been an offense committed in Pittsburg, Pa., if anywhere. *Norris* v. *State,* 25 Ohio St. 217, is cited to sustain the contention on part of the plaintiff in error, The third paragraph of the syllabus of that case holds that : " Where A, by false pretense, contained in a letter sent by mail, procures the owner of goods to deliver them to a designated common carrier in one county, consigned to the writer in another county, the offense of obtaining the goods by false pretense is complete in the former county, and the offense must be prosecuted therein." Whether this rule would have obtained, if the vendor had sent his agent to Clark county and solicited the sale, and the agent had made the bargain with the purchaser there, and sent his order, based on the bargain so made by him, to his principal in another county, we do not know. But we are sure that the rule announced in that case should not be extended to a case like the one before us, by mere implication. The case at bar, and the 25th Ohio St. case are so dissimilar, that we cannot adopt the principle of that case for the determination of this case.

The defendant came to Akron as the solicitor or drummer of the Pittsburgh party, who is a wholesale liquor dealer, and as part of his employment, solicited, and took the order of the Akron purchaser at Akron for the contraband article, wrote out his order at his hotel in Akron, and sent it by letter to his house in Pittsburgh, and the wholesale dealer, pursuant thereto, selecting his own agencies, shipped the article so sold by rail to the purchaser at Akron, who duly received it, and afterward paid the defendant the amount of the purchase price at Akron.

No fact is more clearly established in this case than that defendant was the agent of the Pittsburgh dealer, with authority from him to sell his stock in trade at Akron, and for that purpose stood here in the personality of his principal, who, so far as the sale was concerned, was as much in Akron as his agent. But we are treating a criminal matter, and not a mere civil matter, where important considerations enter into the matter, other than to determine at what time rights, as between the parties, became vested. The state is an important factor to be considered by the court in determining this matter.

What difference did it make whether defendant sent his order by letter or otherwise to his principal ? The act of the agent and his principal, as to the sale, are identical in legal effect. The defendant and his principal did intend to make the sale at Akron, where to say the least, a very important part of the overt act was transacted, and without which no sale could have been made and no offense committed.

But the doctrine of principal and agent does not apply in the commission of crime, except as an evidentiary fact, or circumstance connecting others than the alleged principal or agent with the participation in the prohibited act, as the case may be, where more than one combine to com-

mit such act. The statute is conclusive on this point. "Whoever aids, abets or procures another to commit any offense, may be prosecuted and punished as if he were the principal offender;" Rev. Stat., sec. 6804. Where does the aider commit the criminal act? Logically, where he performs his part of the common design.

What if part of the overt act was committed in Pennsylvania, and the other part consummated in Ohio? The contributory acts of both, nevertheless, constitute the acomplishment of the criminal act, a substantial part of which was committed in Akron, by the accused. The actual delivery of the prohibited article to the common carrier, though out of the state, was only part of the scheme to complete the sale, and resulted in actual delivery to the purchaser here. What difference does it make if some part of the overt act, or elements constituting the offense, were actually transacted in Pennsylvania? It is not essential that each or every part of the offense should have been committed in Ohio, to give it cognizance of the offense. If the accused substantially aided and abetted in committing it in Ohio, he is guilty in Ohio. The rule is well settled that whoever aids or abets in the actual commission of a crime, either at the place of actual commission or elsewhere, is guilty as a principal. For what? Evidently the part executed by him. The question is not how much he contributed, but did he contribute in any substantial degree to its execution. Both the agent and the principal co-operated to consummate the actual delivery to the purcaser in Ohio, a part completion of the offense. The acts of the defendant and his principal co operating with the common carrier who delivered the goods to the purchaser at Akron, a co-operating agent of the seller, combined to round up an accomplished transaction, that, beyond all question, constituted a sale. If defendant did not mean to sell his blackberry, or "B. B." in Akron, what did he come here for? No senseless or impractical evasion should be permitted to shield the dealer from Pennsylvania from the operation of our laws intended to protect our people from prohibited traffic.

But are we to be governed by a rigorous technical definition of the term *sale?* We think the spirit of the law, fairly intepreted, ought to prevail.

The term "sale" is not clearly defined by the law writers or the courts. What facts do or do not constitute a sale in a given case, has been very often judiciaily determined. But where a general definition has been attempted, the product of the effort is far from being uniform or satisfactory. "Upon a critical survey of the various definitions of sale, that view which seems to reconcile all the uses of the word "sale," as in the expressions, "conditional sale," "executory sales," etc., most satisfactorily is to regard "sale" as a contract or agreement for the transferring of ownership, and not as the very transfer itself." Newmark on Sales, 2. Abbott's Law Dict. defines it as follows: "The term "sale" in its largest sense, may include every agreement for the transfer of ownership, whether immediate or to be completed afterwards." Swan's Treatise, that most potential resource for safe direction, defines a "sale" quite comprehensively. Swan's Tr. 759. In this light we are authorized in holding that what the accused did in Akron, constituted a sale in Summit county, so far as to make him liable at least, for aiding and abetting the commission of the offense charged. This leads us to the conclusion that the trial court had jurisdiction of the subject-matter of this prosecution.

Did the court below err in not charging the jury?

However strongly we may feel, that it is a right that ought not to be denied a party tried criminally before a justice of the peace, yet we think the fact that the plaintiff in error simply excepted to the omission of the trial justice to charge the jury, is not sufficient to raise the question suc-

cessfully. By not asking the court to instruct the jury, as to any matter or thing pertaining to the case, or the defendant's rights therein involved, appears to us to be a waiver of the right to insist on a charge on his part. We therefore hold that this exception is not well taken.

This brings us to the consideration of the great question in the case, and over which, I have been much perplexed; that is, the exclusion of evidence tendered by the petitioner in error, on the objection of the state. The questions put, and the evidence offered, are as follows : " What knowledge, if any, did you have, that the liquors sent to him would be other than pure liquors of these kinds? Objected to by state, and sustained by the court. Offer to show  *  *  that he had no knowledge that the liquors sent to H. would be any other than pure liquors of the kinds described in the order which he mailed to the house."

Also, " What knowledge, if any, did you have that Sunstein had, at his house, or place of business, any liquors of the kinds mentioned in this order, that were in any way adulterated ? Objected to by state and sustained by court. Offer to show  *  *  *  that he had no knowledge that S. had any adulterated liquors whatever, of the kinds mentioned in the order."

Was it error to exclude the evidence ? and if so,. was it, considering the whole record, to the prejudice of the right of the accused ? In other words did it tend to prevent a fair trial? If the rejection of the evidence tendered, was not eroneous, then the exception is unavailing, but if it was error for the court to reject it, the former question must be answered affirmatively. But to avail the accused, it must appear to have been prejudical to a fair trial for him. We think the trial court erred in excluding the evidence tendered, and we are sustained in this view, by a current of authorities long continued in Ohio, whose laws we are administering. The following rule is given by Desty's Criminal Law, section 35, and is quoted with approval in *Altschull* v. *State*, 8 C. C., page 219, by BALDWIN, J., a rule that we are willing to accept, to-wit: " That when an offense is so defined that the act of the offender is not a crime unless some independent fact coexists with it, ignorance as to the existence of such fact, or mistaken belief in good faith, and on reasonable grounds that it did not exist, should excuse from crime, but a voluntary or negligent ignorance of such fact will not excuse." We think Ohio has an established rule applicable to prosecutions for crimnal acts like the one at bar. The principle applied in like cases, has been frequently and very clearly announced, from the date of the ruling of the Supreme Court in *Anderson* v. *State*, 7 Ohio, second part, 250, *ex parte Faulk* v *State*, 42 Ohio St. 642.

The following cases develop the rule : *Anderson* v. *State*, 7 Ohio, second part, 250; *Barney* v. *State*, 8 Ohio, 234; *Miller* v. *State*, 3 Ohio St., 475; same parties, 5 Ohio St. 275 ; *Anderson* v. *State*, 22 Ohio St. 305 ; *Crabtree* v. *State*, 30 Ohio St. 382; *Farrell* v. *State*, 32 Ohio St. 456. WOOD, J., in *Birney* v. *State*, announces the doctrine that has obtained in Ohio ever since : " It is true that the statute omits the *scienter*, and the indictment covers all the facts enumerated in that statute, but this is not sufficient ; it cannot be assumed that an act, which independent of positive enactment, involves no moral wrong  *  *  *  should be grievously criminal, when performed in total unconsciousnsss of the facts that affect it with crime." This is the doctrine of all these cases.

The second paragraph of the syllabus of *Farrell* v. *State*, reads as follows: " A person indicted for selling intoxicating liquors, in violation of the provisions of section 1, of the act to provide against the evils resulting from the sale of intoxicating liquors in the state of Ohio,. may, on trial, show that at the time he bought the article, alleged in the indictment to be intoxicating liquor, it was represented to him to

be free from alcoholic properties—that he bought it with the understanding and believing it was not intoxicating liquor, and sold it with such understanding and belief."

A tender was made on the trial of that case, on part of the defendant, to show the fact that he was acting in good faith, and did not know nor believe that the article sold was contraband; but the trial court refused to let the party show the fact. ASHBURN, J., says: "We are unable to see why the proposed testimony was incompetent. The accused's intention at the time of the sale, was involved in the issue. It was competent to show that, from the circumstances of the case, he was free from culpable purpose, and one of the circumstances tending to show freedom from guilty intention in the sale, was the fact, if fact it proved to be, that he had bought the bitters under the information and belief that it was an article free from alcoholic properties; that he sold it, honestly believing, from information obtained at the time of the purchase, that it was not an intoxicating liquor. We think the testimony would have tended to show good faith and want of guilty intention on the part of the accused."

The principle of these cases is too solidly established to be overthrown by the *dicta* of domestic *nisi prius* judges, or the holdings of any courts of our sister states. The contrary doctrine insisted on, is so hostile to an enlightened sense of justice, and so subversive of general confidence and repose in the administration of criminal justice, that I cannot cut loose from the principle of these decisions, without feeling that it would put the court in a false and dangerous attitude.

As I remember now, the statutes defining the offenses reviewed by the Supreme Court in the cases above cited, in no instance define the offense, by "knowingly committing" the acts denounced by the statutes; and most of them were statutes prohibiting the sale of intoxicating liquors, and for the offense defined made the sale prohibitory—statutes on principle like the statute defining the offense for which accused was sentenced. Notably in the case where bitters was sold, the defendant attempted to prove that he didn't know the prohibited article was intoxicating—one of these cases treats the question as to the effect of agency.

That an accused person may not show his good faith in defense of a criminal charge, where the offense made is criminal by prohibition only, because of an assumed public necessity for conviction, that otherwise could not be secured, is a monstrous doctrine, neither existing in principle, nor sustained by considerations of sound public policy; and vastly more dangerous in its application, than the escape of an occasional guilty party. A shadowy excuse for a sacrificial victim to the public wellfare, the victim to be branded with infamy, forfeiture of property and personal liberty, all for the fear—if the truth were made known—that a public prosecution might fail, and the guilty party in other like cases might escape. That was the ground upon which it was argued by the state, that the court did not err, by excluding the testimony tendered. Pure food and drink stand on no higher plane of public care, than pure human conduct, and may well stand or fall with the salutary rules that conserve public virtue, in the trial of crimes *mala in se*.

The practical idea of personal rights, is so fundamental with our people, that the state is prohibited, by constitutional provision, from taking the property of any person for the public benefit, without adequate compensation, and the person is so sacred, that it cannot be employed for the public use, no matter how pressing the emergency, without pay. But the application of the doctrine urged upon the court, would nullify these essential principles of personal liberty and safety, and open the door to the perpetration of grievous wrongs, in the name of the administration of justice, the necessary effect of depriving an accused person of a meritorious de-

fense; and that would prevail, if he were only a great scoundrel and tried for murder, arson, burglary or robbery.    There is no more danger of a failure of public justice in the prosecution of acts *mala prohibita*, than those *mala in se*, and if there was, it would be no excuse why the rights of innocent persons should be wrecked.    The presumption of law attending the voluntary acts of persons, are quite as safe in their application to prohibited crimes merely, as to those which are essentially bad.    The only safe course, as a general rule, is to let each case stand on its intrinsic merits, the facts of the case.    The public certainly should be satisfied with this.    It can never be good policy to convict the innocent as a means of punishing the guilty.    It appears to us, that the rule as laid down by Desty's Criminal Law, section 35, goes as far as it is safe to go.    Under its application good faith may thus be protected, and malevolence punished.

I have spent more time on this branch of the case than may appear to the bar to be profitable, but I am so thoroughly opposed to the application of this rule for the administration of criminal justice, that may trample down the individual right, no matter what the pretext, that I may have been led too much by my personal convictions, and not enough by precedent.    I deem it safest for this court to stand by and adopt the salutary principles often announced by the Supreme Court.

The court now comes to the final determination of the case.    If the evidence adduced on the trial had not been before me, I certainly would reverse the judgment.    But I have carefully read the evidence, not only once, but twice, and some of it oftener, and can come to no other conclusion from it, than that the conviction stands on a solid basis, so far as the facts are concerned.    I do not see how any one can read the evidence, no matter if the accused had sworn in the most unqualified manner that he had no knowledge that the liquor sent to H. would be any other than the kinds described in the order which he mailed to his house, and that he had no knowledge that S. had any adulterated liquors whatever of the kinds mentioned in the order, and that he acted in the utmost good faith, and come to any other conclusion but that plaintiff in error was guilty of the offense charged.    The very order implies a sale of adulterated liquors.    "B. B. wine," or "B. B. brandy," or "blackberry" at sixty-five cents a gallon, a price, as the defendant says in his testimony, that never goes up, and never goes down, must, to every intelligent person, mean a spurious article; and taken in connection with the accompanying order for five gallons port wine at seventy-five cents a gallon, a preposterous price, if a pure article was sold.    No matter what he might have sworn to, as his motives, with respect to the evidence tendered, his whole evidence clearly rebuts an innocent presumption of want of such knowledge giving him the full benefit of the admission of all the evidence he tendered; he says he has had twenty years' experience, and nine years with the Pittsburgh house; under such circumstances, absence of knowledge in his case, was not ignorrance in good faith; to be so ignorant, as the tendered proof would indicate, would be, on the part of the accused, criminal negligence.

The cross-examination of the accused fairly deveveloped the evidence he tendered on the trial below; that is, his knowledge or want of it, respecting the matter tendered; and quite as effectually as if the question had been answered directly by him on his examination in chief in the most positive and unqualified manner.

On motion for a new trial, if he had sworn positively to all that he offered to prove in chief, and had been convicted, taking all the testimony into account, and giving him the benefit of the most positive statements on the witness stand, of all he tendered, we would be compelled to overrule such motion.    The only possible doubt I have about the matter is, did the refusal of the court to permit an answer to the direct question, preju-

dice the rights of the accused in the estimation of the jury, in the application of the evidence afterwards called out upon the matter of his knowledge in the premises? But as no request by him was made to instruct the jury in that respect, we must conclude that his counsel considered it immaterial, and waived it.

The judgment must be affirmed.

*Oviatt, Allen & Cobbs,* for plaintiff in error.

*S. P. Wolcott* and *W. T. Clark,* for defendant in error.

---

(Washington County Court of Common Pleas.)

V. W. HAAS·*v.* THE STATE.

1. A person charged with selling adulterated food, in violation of the act of March 20, 1894, may make the defense based upon the maxim, *ignorantia facti excusat.* Therefore held to be error in the trial of such case, after testimony that the article in question was bought by the accused from a manufacturer of good standing, on the assurance of its purity, to reject evidence that he in good faith believed it to be as represented, when the sale was made, and that the reputation of this maker's goods was that of genuine, pure articles. Also held erroneous to refuse an instruction to the jury, that if they found from the evidence that the defendant had sold the food, and it was adulterated as charged; but further should find that he bought it in good faith, from a reputable concern which manufactured it, believing it to be pure, and at the time he sold the food, he still in good faith believed it was not adulterated, and was in nowise negligent in not knowing it to be impure, that they should find him not guilty.

2. As a general proposition, where a statute is silent as to the defendant's intent or knowledge, the indictment or complaint need not allege, or the State's evidence show that he knew the fact; his being misled concerning it is matter for him to set up in defense and prove. *Held,* that these rules apply in prosecutions for the sale of adulturated foods. Also *held,* that an affidavit, properly entitled, which charged the defendant with having sold to a party named, on a day stated, at a specified county, one-fourth of a pound of food, to-wit: Ground mustard, which was adulterated in the following respect, to-wit: Starch had been added to it, thereby depreciating its strength, contrary to the statute in such case made and provided, and against the peace and dignity of the state of Ohio; was sufficient to put him upon his trial.

(Decided February, 1895.)

---

1. This is a proceeding in error, to reverse a judgment of a Justice of the Peace. The case below was a prosecution under what is popularly known as the " Food Law," passed March 20, 1884, the material provisions of which are as follows:

" Section 1. Be it enacted by the General Assembly of the state of Ohio, that no person shall, within this state, manufacture for sale, offer for sale, or sell any drug or article of food which is adulterated, within the meaning of this act."

Section two defines the terms "drug," and "food," as used in this statute.

Section three states what shall be deemed to be "adulterated," within its meaning. The last clause is as follows:

" Provided, that the provisions of this act shall not apply to mixtures or compounds recognized as ordinary articles or ingredients of articles of food, if each and every package sold or offered for sale be distinctly labeled as mixtures or compounds, with the name and per cent. of each ingredient therein, and are not injurious to health."

Section four says: " Every person manufacturing, offering or exposing for sale, or delivering to a purchaser, any drug or article of food, included in the provisions of this act, shall furnish to any person interested, or demanding the same, who shall apply to him for the purpose, and shall